UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

OPELOUSAS HOTEL GROUP L L C          CASE NO.  6:18-CV-01311

VERSUS                               JUDGE TERRY A. DOUGHTY

D D G CONSTRUCTION INC               MAGISTRATE JUDGE CAROL B.
                                     WHITEHURST

MEMORANDUM RULING

Pending before the Court is a Motion for Summary Judgment on Plaintiff's Fourth
Amended Complaint [Doc. No. 236] filed by Defendant First Mercury Insurance Company ("First
Mercury"). DDG Construction, Inc. ("DDG") filed an Opposition [Doc. No. 243], and First
Mercury filed a Reply [Doc. No. 253] to the Opposition.

For the following reasons, the Motion is **GRANTED**.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On December 5, 2018, Plaintiff Opelousas Hotel Group, LLC ("Plaintiff") filed its Original
Complaint for Damages.[1] Plaintiff subsequently filed several amended complaints.[2] In its Fourth
Amended Complaint, Plaintiff asserted causes of action for breach of contract, negligence in the
supervision and construction of the project, breach of an implied warranty of workmanship,
professional negligence, and redhibition against DDG, its insurers, and several subcontractors.[3]
Plaintiff sued First Mercury as DDG's general liability insurer pursuant to the Louisiana Direct
Action Statute.[4]

---

[1] [Doc. No. 1]
[2] [Doc. Nos. 51, 62, 93, 132]
[3] [Doc. No. 132, pp. 6–9]
[4] La. Rev. Stat. 22:1269

The events leading up to the suit are as follows. On August 12, 2014, Plaintiff entered into a written contract ("Construction Contract") with DDG.[5] Under the Construction Contract, DDG agreed to construct as the "prime, general contractor," a Hampton Inn in Opelousas, Louisiana ("the Project") for the original sum of $4,668,330.00.[6] Under the Construction Contract, DDG would construct the entire hotel. DDG does not employ laborers and did not provide any laborers for the Project.[7] Rather, DDG's role was to hire and manage subcontractors who would be tasked with the actual construction of the hotel.[8] The Construction Contract also provided that it was governed by Louisiana law.[9] According to Plaintiff, on June 1, 2017, DDG was issued a written notice of default due to DDG's "lack of progress and finishing the hotel on time, [and] lack of manpower."[10] The written notice of default allegedly gave DDG seven days to remedy the default.[11] Plaintiff further alleges that after the expiration of the seven days, Plaintiff terminated the Construction Contract.[12]

First Mercury issued the following commercial general liability policies ("CGL") to DDG: Policy No. CA-CGL-0000031914-01 (07/27/2013 to 07/27/2014) (the "2013 Policy");[13] Policy No. NJ-CGL-0000045665-01 (07/27/2014 to 07/27/2015) (the "2014 Policy");[14] Policy No. NJ-CGL-0000045665-02 (07/27/2015 to 07/27/2016) (the "2015 Policy");[15] and Policy No. NJ-CGL-0000045665-03 (07/27/2016 to 07/27/2017) (the "2016 Policy").[16] The 2013 through 2016

---

[5] [Doc. No. 132, p. 9]
[6] [Doc. No. 236-5]
[7] [Doc. No. 236-6, p. 24]
[8] [Id.]
[9] [Doc. No. 236-5]
[10] [Doc. No. 236-7, p. 67]
[11] [Doc. No. 132, pp. 3–4]
[12] [Doc. No. 132, p. 4]
[13] [Doc. No. 236-8]
[14] [Doc. No. 236-9]
[15] [Doc. No. 236-10]
[16] [Doc. No. 236-11]

Policies (collectively, the "Policies") are each subject to a $1,000,000.00 Each Occurrence Limit and $2,000,000.00 General Aggregate Limit and Products-Completed Operations Aggregate Limit. In addition, First Mercury issued excess Policy No. IL- EX-0000065023-01 (06/08/2016 to 07/27/2017) (the "Excess Policy").[17] The Excess Policy is subject to a $5,000,000.00 Each Occurrence Limit, General Aggregate Limit, and Products-Completed Operations Limit. First Mercury accepted DDG's defense of the lawsuit subject to a reservation of rights.[18]

First Mercury contends that the Policies do not provide coverage for Plaintiff's damages because the damage did not occur during the First Mercury policy periods. In support of this argument, First Mercury contends that Plaintiff's damages did not manifest until after their replacement contractor discovered the alleged defects in September 2017, after the last First Mercury policy period terminated on June 27, 2017.[19] First Mercury also argues that several exclusions contained within the Policies prevent Plaintiff from recovering for any of the damage allegedly caused by DDG.[20] DDG contends in opposition that there are genuine issues of material fact as to when the damage allegedly caused by DDG was discovered and the existence or extent of any damage caused by DDG.[21]

The issues are briefed, and the Court is prepared to rule.

## II.   LAW AND ANALYSIS

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary

---

[17] [Doc. No. 236-12]
[18] [Doc. No. 208-1]
[19] [Doc. No. 236-1, p. 4]
[20] [Id.]
[21] [Doc. No. 243]

judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion."

"If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (internal quotation marks and citation omitted).; *see also* FED. R. CIV. P. 56(c)(1).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248). However, in evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, even if the affidavit is self-serving and uncorroborated." *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (citations omitted).

Note that "a district court has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *see also Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) ("If

decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved . . . . The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.").

### B.  Analysis

First Mercury contends that the Direct-Action suit against it as DDG's insurer must be dismissed for two chief reasons: 1) the policies contain exclusions barring any hypothetical recovery from First Mercury as DDG's insurer, and 2) the policies were not in effect because damages did not "manifest" until after all of the coverage periods had elapsed. DDG responds that genuine issues of material fact preclude summary judgment. At issue in First Mercury's first argument are general principles of contract interpretation and whether the exclusions apply to the damages claimed by Plaintiff. At issue in First Mercury's second argument is whether the Court should apply the "manifestation theory" trigger of policy coverage, or whether it should apply some other theory.

The parties do not dispute that the interpretation of the Policies is controlled by Louisiana law. The Court agrees and finds that Louisiana law applies to interpretation of the policies. *See Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014) (Federal courts sitting in diversity apply the choice-of-law rules of the forum state.); *see also Champagne v. Ward*, 2003-3211 (La. 1/19/05); 893 So.2d 773 (In cases involving contractual interpretation of an insurance policy, Louisiana courts employ the law of the state whose policies would be most seriously impacted if its law was not applied.); *see also* La. C.C. Art. 3537.

5

**1.     Insurance Contract Interpretation Under Louisiana Law**

Under Louisiana law, an insurer's duty to defend an insured is a separate and distinct inquiry from the insurer's duty to indemnify the insured in the underlying liability case. *Arceneaux v. Amstar Corp.*, 2015-0588 (La. 9/7/16), 200 So. 3d 277, 281 (*citing Elliott v. Cont'l Cas. Co.*, 2006-1505 (La. 2/22/07), 949 So. 2d 1247, 1250). In determining whether an insurance contract creates a duty to defend, Louisiana courts apply the "Eight Corners Rule." *See Pontchartrain Nat. Gas Sys. v. Texas Brine Co., LLC*, 2018-0244 (La. App. 1 Cir. 10/11/18), 264 So. 3d 545, 552–53, *writ denied*, 2019-0080 (La. 3/6/19), 264 So. 3d 1204, (*citing Maldonado v. Kiewit La. Co.*, 2013-0756 (La. App. 1 Cir. 3/24/14), 146 So. 3d 210, 218)). The Eight Corners Rule compares the plaintiff's petition to the policy without considering extrinsic evidence. *Id.* A duty to defend is created unless the policy unambiguously excludes coverage as applied to the allegations in the petition. *Arceneaux*, 200 So.3d at 281–82 (*citing Steptore v. Masco Constr. Co.*, 93-2064 (La. 8/18/94), 643 So. 2d 1213, 1218)); *Elliott*, 949 So. 2d at 1250. If the pleadings against the insured disclose even a possibility of liability under the policy, the insurer has a duty to defend the insured. *Id.* at 282 (citing *Steptore*, 643 So. 2d at 1218); *Elliott*, 949 So. 2d at 1250; and *Meloy v. Conoco, Inc.*, 504 So. 2d 833, 839 (La. 1987)).

Here, First Mercury accepted DDG's defense with a reservation of rights. Because DDG made no claims against First Mercury for failure to accept its defense, the Court assumes for the purposes of this Motion that First Mercury had a duty to defend and acted in conformity with said duty. However, the question of an insurer's duty to defend is a different question than an insurer's duty to indemnify.

An insurer's duty to indemnify depends on the facts established in the lawsuit. *Hanover Ins. Co. v. Superior Labor Servs., Inc.*, 11-2375, 2016 WL 7156067, at *2 (E.D. La. Dec. 8, 2016)

("The duty to indemnify is 'triggered by actual facts that establish liability in the underlying lawsuit.'"); *see also Admiral Ins. Co. v. Dual Trucking, Inc.*, CV 20-383, 2020 WL 2526952, at *8 (E.D. La. May 18, 2020). When uncontroverted facts preclude the possibility of a duty to indemnify, "the duty to defend ceases and the duty to indemnify is negated." *Donahue v. Republic Nat'l Distrib. Co.*, 489 F.Supp.3d 455, 470 (E.D. La. 2020).

First Mercury maintains that coverage is excluded under the Policies because of several exceptions.[22] First Mercury also argues that damages did not occur during the policy periods because defects did not manifest until after the last policy period terminated, and that Plaintiff's breach of contract claims against DDG are not an occurrence or property damage as defined in the Policies.[23] DDG argues in response that there are genuine issues of material fact as to whether coverage under the Policies was triggered due to conflicting testimony as to when the damage occurred.[24] DDG also argues that there are genuine issues of material fact as to the existence of any deficiencies in the work it performed, and, in the alternative, the extent of damages arising out of any alleged deficiencies.[25]

The Court agrees with First Mercury that the exclusions in the Policies clearly and unambiguously preclude coverage for the damages sought by the Plaintiff in its Direct-Action Statute suit against First Mercury. The Court also finds that the manifestation theory of trigger of coverage applies to the Policies and that under the manifestation theory, Plaintiff's damages did not occur during the First Mercury policy periods.

---

[22] *See* [Doc. No. 236-1, p. 5]
[23] *See* [Id.]
[24] *See* [Doc. No. 243, p. 3]
[25] *See* [Id. at pp. 6–7]

#### i.    The Policy Exclusions

First Mercury argues that the following Policy Exclusions preclude suit against it for indemnity or contribution under the Direct Action Statute: Damage to Property Exclusion,[26] Damage to Your Product Exclusion,[27] Damage to Impaired Property or Property Not Physically Injured Exclusion,[28] Exterior Insulation and Finish Systems Exclusion ("EIFS Exclusion"),[29] Professional Liability Exclusion,[30] and Contractual Liability Exclusion.[31] The Court will address each exclusion below.

#### a.   Damage to Property Exclusion

The Policies contain a Damage to Property Exclusion which states that:

> **j. Damage To Property**
>
> "Property damage" to: . . .
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.[32]

Under the Policies, "Your Work" is defined as follows:

> **22.** "Your work":
>
> **a.** Means:
>
> (1) Work or operations performed by you or on your behalf; and
>
> (2) Materials, parts or equipment furnished in connection with such work or operations.

---

[26] *See* [Doc. Nos. 236-8, pp. 8-9, 236-9 pp. 66-67, 236-10, pp. 128–129, and 236-11, pp. 197–98]
[27] *See* [Doc. Nos. 236-8, p. 9, 236-9 p. 67, 236-10, p. 129, and 236-11, p. 198]
[28] *See* [Id.]
[29] *See* [Doc. Nos. 236-8, p. 33, 236-9 p. 90, 236-10, p. 154, and 236-11, p. 224]
[30] *See* [Doc. Nos. 236-8, p. 31, 236-9 p. 91, 236-10, p. 155, and 236-11, p. 225]
[31] *See* [Doc. Nos. 236-8, p. 6, 236-9 p. 64, 236-10, p. 126, and 236-11, p. 195]
[32] *See supra* footnote 26.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.[33]

First Mercury asserts that Exclusions (j)(5) and (j)(6) of the Damage to Property Exclusions are intended to limit coverage for defective work performed by the insured.[34]

In *Supreme Servs. & Specialty Co. v. Sonny Greer, Inc.*, 2006-1827 (La. 5/22/07), 958 So. 2d 634, 641, the Louisiana Supreme Court held that a CGL containing the "work product" exclusion "does not insure any obligation of the policy holder to repair or replace his own defective product." The court also noted that a CGL policy "is not written to guarantee the quality of the insured's work or product." *Id.* (quoting *McMath Const. Co. v. Dupuy*, 2003-1413 (La. App. 1 Cir. 11/17/04), 897 So. 2d 677, *writ denied*, 2004-3085 (La. 2/18/05), 896 So. 2d 40).

Here, the Damage to Property Exclusion unambiguously precludes coverage for any damage arising out of DDG's defective work. Subsection j(5) applies to the property in question here because the Plaintiff alleges that subcontractors hired by DDG performed defective work. Similarly, subsection j(6) also applies as Plaintiff hired replacement contractors and subcontractors to finish and repair DDG's allegedly deficient work. There is also no question that DDG's work qualifies as "your work" under the Policies. DDG hired various subcontractors to complete the construction of the hotel. Therefore, the work to construct the hotel qualifies as work or operation performed "on your (DDG's) behalf."

The evidence makes clear that all of the damage occurred on property worked on by DDG's subcontractors and did not affect other property. Ladd Ehlinger's Report, the report relied upon by

---

[33] [Doc. Nos. 236-8, p. 20, 236-9 p. 78, 236-10, p. 140, and 236-11, p. 209]
[34] [Doc. No. 236-1, p. 19]

DDG's corporate representative, identifies numerous errors made by Plaintiff's architect and DDG.[35] Specifically, the following errors were identified and attributed to DDG and the Plaintiff's architect in Ehlinger's Report:

> inadequate waterproofing of an elevator pit,
> floating vanities falling off the wall,
> improper Exterior Insulation and Finish System ("EIFS"),
> the roof access hatch opens the wrong direction,
> stairwells missing layers of gypsum board,
> fireproofing, and incorrect paint,
> the Store Front and windows lack end dams to prevent leaks,
> unconventional behavior by the architect,
> the structural steel column block outs were not filled with concrete,
> improper framing causing door frames not to fit properly,
> ceilings not uniform,
> lobby walls out of plumb with elevator frames,
> a single stud (rather than a double stud) installed on the underside of the floor trusses,
> the elevator shaft failing to meet structural requirements,
> two fresh air makeup units for HVAC not installed,
> electrical and mechanical work not up to code,
> dryer lint traps installed too far below the slab,
> washing machine pad not properly designed to accommodate the volume of water discharged by the washing machines,
> inability of roof drains to discharge into the storm drainage,
> no provisions to run irrigation piping under the parking lot,
> use of the wrong forms, and
> conflicts of interest.[36]

All of these alleged errors concern the particular parts of property that DDG or its subcontractors worked on, and none reference damage to other property. Additionally, the Fourth Amended Complaint alleged the following problems associated with the design and construction of the Project:

> One of the two fresh air makeup units was not installed;
> roof drains not tied into storm drainage;
> failed to install conduit in parking areas to allow for electrical wiring to light poles;

---

[35] [Doc. No. 236-16]
[36] [Id.]

> failed to properly design and install irrigation lines under the parking lot to service landscape areas around the building;
> failed to properly design and install commercial washing machine pad to accommodate volume of water discharged by the washing machines;
> failed to design and install the elevator shaft in accordance with structural requirements;
> failed to properly design and install the structure and interior spaces;
> failed to fill structural steel columns with concrete;
> failed to design and install the structure to required two-hour fire rating;
> failed to properly construct and waterproof the elevator pit;
> failed to properly install the roof access hatch;
> failed to properly design and install dryer lint trap;
> failed to design and install electrical work in compliance with applicable code sections;
> failed to design and install mechanical work in compliance with applicable code sections;
> defectively designed and constructed the exterior EFIS cladding;
> failed to properly design exterior window bracing and framing;
> failed to properly design and construct truss system;
> failed to properly design and install the foundation system and failed to design and install adequate blocking to support floating vanities.[37]

Every specific item of damage identified by Plaintiff only concerns that particular part of property that must be restored, repaired, or replaced because DDG's work was incorrectly performed on that property, and no item of damage identifies damage to other property, i.e. damage to property that DDG's subcontractors did not design or construct. Accordingly, the Court finds that the Damage to Property Exclusion applies to exclude coverage of all damages related to repairing or correcting DDG's allegedly deficient work.

### b. Damage to Your Product Exclusion

The Policies define and exclude damage to "Your Product." "Your Product" is defined as:

> **(k)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> **(a)** You;

---

[37] [Doc. No. 132, pp. 5–6]

        **(b)** Others trading under your name; or

        **(c)** A person or organization whose business or assets you have acquired; and

        **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes

        **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)** The providing of or failure to provide warnings or instructions[.][38]

In *Atain Specialty Ins. Co. v. VIG II, LLC*, CV 15-6499, 2017 WL 3867672 (E.D. La. Feb. 9, 2017), the court analyzed a similarly worded "Your Product Exclusion." The court noted that the exclusion "encompasses damage to the product itself." Id. at 6. The court first determined what qualified as the insured's "product," and then determined whether the plaintiff alleged damage to anything other than the insured's product. Id. at 6–7. The insurer claimed that the plaintiff's entire home was the insured's product. Id. at 6. The court noted that the insured sold "the entire home" to plaintiffs. Id. The policies defined "product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . [y]ou." Id. Based on this definition, the court found that the home was a good or product that was both manufactured and sold by the insured, and that the Damage to Your Product provisions precluded indemnification for all damage to the plaintiffs' home. The court further noted that the insurer owes coverage only if the petition "includes claims for damage to anything other than the home itself." Id. at *7. The petition contained no allegations of damage to anything other than the home itself so the court found that the policies and petition "unambiguously preclude coverage." Id.

---

[38] *See supra* footnote 27.

Here, DDG was the general contractor for the Project. DDG's corporate representative stated that DDG's role was to manage the entire construction of the hotel. Therefore, the Project itself – the construction of the hotel – is DDG's product. The Damage to Your Product Exclusion unambiguously precludes coverage for such products. First Mercury owes coverage only for damage to other property. As explained above, Plaintiff has not identified damage to any property other than property constructed or designed by DDG or one of its subcontractors. Like the plaintiff in *Atain*, Plaintiff seeks only the cost of repairing the damage to the Hampton Inn and remedying the defects in the Project. Accordingly, the Court finds that the Damage to Your Product Exclusion precludes coverage for damages arising out of the cost of repairing damage to the Project itself.

### c. Damage to Impaired Property or Property Not Physically Injured

The Policies include a "Damage to Impaired Property Exclusion" which states:

> **m.** Damage To Impaired Property Or Property Not Physically Injured
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>> **(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>>
>> **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.[39]

Section V in the Policies includes the following relevant definitions:

> **8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>> **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

---

[39] *See supra* footnote 28.

> **b.** You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.[40]

In *Stewart Interior Contractors, L.L.C. v. Metalpro Indus., L.L.C.*, the Louisiana Fourth Circuit Court of Appeals examined an identical provision in a CGL. The court found the provision to be "clear and unambiguous" and noted that it "precludes coverage from damage to property that has not been physically injured or for which only loss of use is sought." 2007-0251 (La. App. 4 Cir. 10/10/07), 969 So. 2d 653, 663–64, *citing N. Am. Treatment Sys., Inc. v. Scottsdale Ins. Co.*, 2005-0081 (La. App. 1 Cir. 8/23/06), 943 So. 2d 429, *writ denied*, 2006-2918 (La. 2/16/07), 949 So. 2d 423, and *writ denied*, 2006-2803 (La. 2/16/07), 949 So. 2d 424; *PCS Nitrogen Fertilizer, L.P. v. U.S. Filter/Arrowhead, Inc.*, 2001-2577 (La. App. 1 Cir. 11/8/02), 834 So. 2d 456, 459. The court also noted that the exclusion "does not apply where there is physical damage to property other than the insured's work or product after the product has been put to its intended use." *Id. citing Gaylord Chem. Corp. v. ProPump, Inc.*, 1998-2367 (La. App. 1 Cir. 2/18/00), 753 So. 2d 349, 355.

Here, as stated above, the Ehlinger Report and Fourth Amended Complaint describe numerous items which were inadequately constructed or designed by DDG or its subcontractors. There is no evidence that any of these defective items damaged property which was not constructed or designed by DDG or its subcontractors. Accordingly, the Court finds that the Damage to Impaired Property or Property Not Physically Injured Exclusion clearly and unambiguously excludes liability for loss of use attendant to the repair of property constructed or designed by DDG or its contractors.

---

[40] [Doc. Nos. 236-8, p. 9, 236-9 p. 67, 236-10, p. 129, and 236-11, p. 198]

### d.  Exterior Insulation and Finish Systems Exclusion

The Policies include an EIFS Exclusion which states:

> **A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:
>
> > **1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or
> >
> > **2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.
>
> **B.** The following definition is added to the Definitions Section: "Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:
>
> > **1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;
> >
> > **2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;
> >
> > **3.** A reinforced or unreinforced base coat;
> >
> > **4.** A finish coat providing surface texture to which color may be added; and
> >
> > **5.** Any flashing, caulking or sealant used with the system for any purpose.[41]

This EIFS Exclusion precludes coverage for "property" damage attributable to any EIFS. The EIFS Exclusion also excludes coverage for the insured's "product" or "work" with respect to a structure using EIFS or a substantially similar system.

---

[41] *See supra* footnote 29.

Here, the Fourth Amended Complaint alleges damages for defectively designed and constructed exterior EIFS cladding.[42] Additionally, the Ehlinger Report states that the EIFS was not properly designed or constructed. Accordingly, the Court finds that the EIFS Exclusion is clear and unambiguous and that it excludes coverage for damage related to the improper design or construction of the EIFS.

### e.   Professional Liability Exclusion

The Policies contain a Professional Liability Exclusion which states:

> **1.** This insurance does not apply to "bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
>
>> **a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
>>
>> **b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform. . . .
>
> **2.** Subject to Paragraph 3. below, professional services include:
>
>> **a.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
>>
>> **b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.
>
> **3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.[43]

This exclusion precludes coverage for "property damage" arising out of the rendering or failure to render professional services by DDG and its subcontractors. Additionally, this exclusion precludes coverage for property damage arising out of providing or hiring independent professionals to

---

[42] [Doc. No. 132, p. 26]
[43] *See supra* footnote 30.

16

provide engineering, architectural, or surveying services in connection with construction work DDG performs. *See Project Consulting Servs., Inc. v. Emps. Ins. Co. of Wausau*, No. CV 20-1441, 2021 WL 4148100 (E.D. La. Sept. 13, 2021), *appeal dismissed*, No. 21-30651, 2022 WL 1165408 (5th Cir. Feb. 25, 2022) (Where the court held that an insurer had no duty to defend the insured from a professional liability claim because of a similarly worded professional liability exclusion).

Here, Plaintiff alleges several damages associated with the design of the Project.[44] The Court finds that the Professional Liability Exclusion is clear and unambiguous. The Court also finds that this exclusion precludes coverage of DDG providing engineering, architectural, or surveying services, and DDG hiring independent professionals to provide engineering, architectural, or surveying services in connection with construction work performed by DDG.

### f.   Contractual Liability Exclusion

The Policies include a Contractual Liability Exclusion which excludes the following:

> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
> > (1) That the insured would have in the absence of the contract or agreement; or
> >
> > (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
> >
> > > (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
> > >
> > > (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative

---

[44] *See* [Doc. No. 132, pp. 5–6]

dispute resolution proceeding in which damages to
which this insurance applies are alleged.

An "occurrence" in the breach of contract context takes place when the defective workmanship or

the incorporation of defective materials result in related property damage. *Markel Am. Ins. Co. v.*

*Schubert's Marine E., Inc.*, CIV.A. 04-376, 2007 WL 54808, at *3 (E.D. La. Jan. 5, 2007) (*citing*

*Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 604–05 (5th Cir. 1991)). Here, as explained above,

although Plaintiff has identified several defects in DDG's work, Plaintiff has not identified any

other property damage caused by those defects. Accordingly, the Court finds that no "occurrence,"

as defined in the Policies, has taken place, and that the Contractual Liability Exclusion precludes

coverage for any contractual liability that may arise out of DDG's defective work.

### ii.   Trigger of Coverage

Although the Court finds that the Policies exclude coverage of any hypothetical damage

Plaintiff may seek to recover from First Mercury on behalf of DDG, the Court nonetheless will

examine whether coverage under the Policies was triggered. First Mercury argues that coverage of

the Policies is triggered once the damages first "manifest," and that the Policies do not afford

coverage to DDG because the damages did not manifest until after the last Policy terminated on

June 27, 2017. Additionally, First Mercury argues that breach of contract claims do not constitute

"an occurrence" under the Policies. In response, DDG argues that there is a genuine issue of

material fact as to when the damages first manifested because of testimony by the owner of the

construction company hired to replace DDG and testimony by DDG's corporate representative.

The Court finds that the manifestation theory of trigger of damages applies to the Policies

and that there is no genuine issue of material fact as to whether damages occurred during the First

Mercury policy periods.

### a. Manifestation of Damages

Louisiana courts generally apply the manifestation theory of damages to determine when property damage takes place for purposes of triggering coverage for construction defects. *See Mann v. Tim Clark Constr.*, LLC, 2018-0961 (La. App. 4 Cir. 5/22/19), 273 So. 3d 397, 402–03, *writ denied*, 2019-01019 (La.10/1/19), 280 So. 3d 158; *Rando v. Top Notch Props., L.L.C.*, 2003-1800 (La. App. 4 Cir. 6/2/04), 879 So. 2d 821, 833. Under the manifestation theory, property damage "occurs" when it first becomes manifest, regardless of when the act that caused the damage occurred. *Mann*, 273 So. 3d at 402–03 (*citing Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 2010-2267 (La. 10/25/11), 79 So. 3d 246, 278 n.75); *M & R Drywall, Inc. v. MAPP Constr., LLC*, 2017-0186 (La. App. 1 Cir. 4/29/19), 280 So. 3d 260, 276, *writ denied sub nom. M&R Drywall, Inc. v. Mapp Constr., LLC*, 2019-01325 (La. 11/19/19), 282 So. 3d 1073, and *writ denied,* 2019-01403 (La. 11/19/19), 282 So. 3d 1073, and *writ denied,* 2019-01411 (La. 11/19/19), 282 So. 3d 1074. Further, "[w]hen uncontroverted facts preclude the possibility of a duty to indemnify, the duty to defend ceases and the duty to indemnify is negated." *Donahue*, 489 F. Supp. 3d at 470.

The Court finds that the manifestation theory of trigger of coverage applies here. Further, the uncontroverted testimony establishes that damages manifested after the last First Mercury policy period terminated, precluding the possibility that First Mercury has a duty to indemnify DDG.

The Court rejects DDG's argument that there is a genuine issue of material fact as to whether coverage was triggered under the Policies. In support of its argument, DDG relies upon the testimony of Pinu Patel ("Patel"), owner of the construction company hired to replace DDG, and Suni Desai ("Desai"), the corporate representative of DDG.

According to DDG, Desai testified that he "could not recall" whether DDG did any additional work during or immediately following the issuance of the alleged notice of default. As noted above, the notice of default was allegedly issued on June 1, 2017, the Construction Contract was terminated by Plaintiffs seven days afterwards, and the last First Mercury policy Period terminated on June 27, 2017. DDG's argument as to when work on the Construction Project ended is irrelevant as to whether coverage under the Policies was triggered. It is undisputed that DDG performed work on the Project while the Policies were in effect. The pertinent question is whether any damages manifested before June 27, 2017, the date the last First Mercury policy Period ended.

DDG also cites to Patel's deposition testimony to support its argument. Patel testified that the Project was approximately fifty percent finished when his company took over construction of the hotel; specifically, he stated:

> Fifty percent when I -- when they told me to take over, and that's the reason I told them there's not enough money left because there's a lot of redo's that we would need to do. And then on top of it, whoever the sub-contractor, the new sub- contractor, would have had to walk in there and find out what's happening, what happened, how did it do, and all that good stuff.[45]

According to DDG, "there is a question as to when the visit that Mr. Patel referenced took place such that any issues with the work could have manifested or been identified at that time."[46] Patel's company took over the Project in September 2017,[47] but it is unclear when Patel's initial visit took place.

The date of Patel's visit could be a relevant issue if he had testified that he observed defects during that initial visit, but he testified that he observed no defects during his first visit. Specifically, Patel testified:

---

[45] [Doc. No. 243-2, pp. 32-33]
[46] [Doc. No. 243, p. 6]
[47] [Doc. No. 236-7, p. 198]

> Q Although no errors were pointed out, in your experience as a
> general contractor while you were there, --
> A Uh-huh.
> Q -- did you observe any construction defect errors?
> A No.[48]

Further, Patel testified that construction defects were not "pointed out" during his visit, that the visit took place for "30, 40 minutes max," that "everything was locked," that he "didn't want to go inside," and that he was not there long enough to "say or point out any errors."[49] Patel's testimony demonstrates that any factual issue as to when his visit took place is irrelevant because there is no evidence that he observed any defect during his visit.

Desai also testified that Patel's company discovered the defects while trying to obtain approval from city inspectors so that the hotel could open. This demonstrates that the defects must have been discovered sometime after Patel's company took over. Patel's company took over in September of 2017. The last First Mercury policy period ended in June of 2017. Desai's testimony demonstrates that there is no factual issue as to when the damages were first discovered, i.e., when the damages first "manifested." Accordingly, the Court finds that coverage under First Mercury's Policies was not triggered because the damage did not manifest until sometime after the last Policy expired.

## III.    CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion for Summary Judgment on Plaintiff's Fourth Amended Complaint [Doc. No. 236] filed by Defendant First Mercury Insurance Company ("First Mercury") is hereby **GRANTED**.

---

[48] [Doc. No. 243-2, p. 32]
[49] [Id.]

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that any claim against

First Mercury set out in the Fourth Amended Complaint [Doc. No. 132] is hereby **DISMISSED**

**WITH PREJUDICE**.

MONROE, LOUISIANA, this 29th day of December, 2022.

Terry A. Doughty
United States District Judge